**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED

FEB 07 2018

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | **18 CR - 68** |
| **v.** | § | |
| | § | CRIMINAL NO. |
| **UJU OKIGBO,** | § | (under seal) |
| (a/k/a "Uju Ernest") | § | |
| (a/k/a "Uju Ohazurike") | § | 18 U.S.C. § 1349 |
| **CHIOMA OKAFOR,** | § | 18 U.S.C. § 1343 |
| (a/k/a "Chioma Santos") | § | 18 U.S.C. § 1956(h) |
| **MARITA RANALAN UNDERWOOD,** | § | 18 U.S.C. § 1956(a)(1)(B)(i) |
| **JOHN CHRISTIAN RUTLEDGE,** and | § | 18 U.S.C. § 1957 |
| **OSA MAY MARTIN,** | § | 18 U.S.C. § 371 |
| Defendants. | § | 18 U.S.C. § 1028A |

## INDICTMENT

**THE GRAND JURY CHARGES:**

### General Allegations

1.      As described in this Indictment, an "advance-fee scheme" was a type of fraudulent scheme where victims were induced to pay certain fees on the false belief that payment must first be made to receive a promised good or service, when in reality the good or service was never going to be, and never was in fact, provided.

2.      As described in this Indictment, an "investment scam" was a type of advance-fee scheme where the defendants and other co-conspirators impersonated various U.S. financial institutions and posed as those institutions' representatives at in-person meetings, over the phone, and over the Internet to fraudulently offer investment funding to U.S. and foreign residents in exchange for paying certain advance fees.

3.     As described in this Indictment, an "inheritance scam" was a type of advance-fee scheme where the defendants and other co-conspirators impersonated various U.S. financial institutions and posed as those institutions' representatives at in-person meetings, over the phone, and over the Internet to fraudulently offer to facilitate the transfer of a supposed inheritance to U.S. and foreign residents in exchange for paying certain advance fees.

4.     The U.S. financial institutions in whose names the defendants and co-conspirators perpetrated the investment and inheritance scams include, but are not limited to:

   a.     BB&T Corporation ("BB&T"), a financial institution headquartered in Winston-Salem, North Carolina; and

   b.     JPMorgan Chase ("Chase"), a financial institution headquartered in New York, New York.

5.     The actual BB&T and Chase, as well as the institutions' employees, did not participate in the scams.

6.     Both the investment scam and the inheritance scam involved the fabrication of U.S. government seals and documents, and the online impersonation of real U.S. government officials, to make the victims believe that various branches of the U.S. government were guaranteeing or facilitating the supposed investment or inheritance.

### Roles in the Operation

7.     The defendants and co-conspirators played the following roles in furtherance of the conspiracy:

   a.     Money Movers:  The defendants referred to below as "money movers" were located in the United States and received the victims' funds by MoneyGram or wire transfers into bank accounts they had opened and controlled.  The money movers, at co-

conspirators' directions, would quickly dispose of the victims' funds upon their receipt by, including, but not limited to: (1) withdrawing the funds in cash; (2) wiring the funds to other money movers; (3) wiring the funds to exporters, who were under instructions to purchase various goods and ship them to co-conspirators in Nigeria; and (4) using the funds to purchase vehicles and then shipping them to co-conspirators in Nigeria.

b.      Representatives:  The defendants referred to below as "representatives" posed as agents or employees of financial institutions at in-person meetings with the victims. When visiting victims in foreign countries, representatives signed the supposed investment agreements and made sham visits to the local U.S. embassy or consulate to make the victim believe that the U.S. government, in exchange for cash payments, was sponsoring or guaranteeing the investment agreement.  In reality, the representatives kept the cash payments for themselves.

c.      Catchers:  Unnamed co-conspirators referred to in this Indictment as "catchers" operated various online personalities, to include the identities of real U.S. government employees and supposed financial consultants, to lure victims into the scheme and convince victims that the supposed investment or inheritance was authentic.

**The Defendants**

8.      Defendant UJU OKIGBO, a resident of Houston, Texas, was a money mover in the scheme.

9.      Defendant CHIOMA OKAFOR, a resident of Houston, Texas, was primarily a money mover in the scheme.

10.     Defendant MARITA RANALAN UNDERWOOD, a resident of Manila, Philippines, was a representative in the scheme.

11.     Defendant JOHN CHRISTIAN RUTLEDGE, a resident of Yaphank, New York, was a representative in the scheme.

12.     Defendant OSA MAY MARTIN, a resident of Carthage, Missouri, was a representative in the scheme.

### Other Relevant Entities and Individuals

13.     U-4CS Services, LLC, and ONAC Services LLC, were companies owned and controlled by OKIGBO that purported to offer export services.

14.     Check Cashing Business #1 was a money service business with retail branches around the country that provided, among other services, money transfers via MoneyGram and Western Union.  From in or about September 2014 to in or about March 2016, OKAFOR was employed at Check Cashing Business #1 locations in the Houston area.

15.     Chase Executive #1 was a real executive with Chase whose identity was stolen and used in furtherance of the investment scam, in that emails were sent and phone calls made to victims under the pretense that it was actually Chase Executive #1.

16.     BB&T Executive #1 was a real executive with BB&T whose identity was stolen and used in furtherance of the investment scam, in that emails were sent and phone calls made to victims under the pretense that it was actually BB&T Executive #1.

17.     Money Mover #1 was a resident of Indianapolis, Indiana and functioned as a money mover in the conspiracy.

18.     Representative #1 was a resident of Miami, Oklahoma and functioned as a representative in the conspiracy alongside MARTIN.

19.     Representative #2 was a resident of Culpepper, Virginia and functioned as a representative in the conspiracy.

20.     Representative #3 was a resident of Brown City, Michigan and functioned as a representative in the conspiracy.

21.     Representative #4 was a resident of Gardena, California and functioned as a representative in the conspiracy.

### Scope of the Scheme

22.     The defendants and their co-conspirators perpetrated the investment and inheritance scam and scheme in over 20 countries, including the United States, and defrauded victims of more than $7 million.

### COUNT ONE
Conspiracy to Commit Wire Fraud
(18 U.S.C. § 1349)

23.     Beginning in or around October 2014, and continuing through in or about the date of the Indictment, in the Houston Division of the Southern District of Texas, and elsewhere, defendants:

**UJU OKIGBO,**
**CHIOMA OKAFOR,**
**MARITA RANALAN UNDERWOOD,**
**JOHN CHRISTIAN RUTLEDGE,**
and
**OSA MAY MARTIN,**

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the grand jury to commit wire fraud, in violation of Title 18, United States Code Section 1343, that is, having knowingly, and with the intent to defraud, devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme did knowingly transmit and cause to be transmitted by means of wire in interstate commerce, writings, signs, signals, pictures and sounds.

## Purpose of the Conspiracy

24.     It was a purpose of the conspiracy that the co-conspirators would unlawfully enrich themselves, in an amount that exceeded $7 million, by deceiving victims into making payments to co-conspirators as part of purported investment and money transfer agreements with U.S. financial institution, when the payments were simply kept by the co-conspirators, who knew the agreements were shams.

## Manner and Means of the Conspiracy

25.     The manner and means by which the co-conspirators sought to accomplish the object and purposes of the conspiracy included, among other things, the following:

a.     Catchers would send phishing emails to potential victims in over 20 countries around the world in the names of bogus or stolen personalities—either investment consultants, advisers, or bankers—in which the catcher would falsely promise the potential victim that an investment sum or inheritance, usually in the amount of tens of millions of U.S. dollars or euros, was available.

b.     Using authentic-looking email addresses paired with falsely registered domain names, the catchers would then send additional fake emails claiming to be from BB&T or Chase employees who would supposedly facilitate the investment or inheritance.

c.     Catchers, using these new personalities, would inform potential victims that a BB&T or Chase representative would visit them in the country where they lived to officially sign and ratify an agreement, when in truth and in fact the representative traveling to meet them had no employment relationship with BB&T or Chase.

d.     Co-conspirators would pose as financial institution employees, including BB&T Executive #1 and Chase Executive #1, on phone calls with the potential victims, using

spoofed phone numbers that made it appear the calls were originating from the states where

BB&T and Chase were respectively headquartered.

       e.    Catchers would convince victims to purchase first-class airline tickets and

pay for business hotel accommodations for the representatives to travel from the United States to

their country or their city in the United States by misrepresenting that such expenses were

required per the agreement with the financial institution.

       f.    Catchers would convince victims that the U.S. government was

sponsoring the investment or inheritance and that, as evidence of this sponsorship, the U.S.

embassy would supposedly notarize and ratify the investment agreement, when in truth and in

fact neither the U.S. government nor any U.S. embassy or consulate was sponsoring the

investment opportunity with the financial institution.

       g.    Catchers would convince victims that the U.S. embassy or consulate

charged a notarization fee, due in cash to the representatives, ranging from approximately $5,000

to $10,000, when in truth and in fact no U.S. embassy or consulate charged such a fee.

       h.    After receiving the cash, the representatives would enter the U.S. embassy

or consulate and wait in the consular affairs section on the false pretense that U.S. government

employees were notarizing the agreement in exchange for the fees, and then give or email the

victims fraudulent receipts that purported to be issued, and fraudulent agreements that purported

to be notarized, by U.S. embassies or consulates.

       i.    After the representatives visited the embassies, the catchers would then

make additional requests of victims that they pay various up-front fees before the investment

funding could be released, which caused victims to make MoneyGram payments and interstate

and international wire transfer payments to bank accounts under the control of money movers in, among other places, the Southern District of Texas.

        j.     Catchers would continue to fabricate additional reasons why more payments were needed before the investment funding could supposedly be released, until a victim gave up and ceased communicating with the catchers.

        k.     The money movers, upon co-conspirators' instructions, would quickly disburse the victims funds upon receiving them, including by withdrawing the victims' funds and purchasing, among other things, cars, which would then be shipped to co-conspirators in Nigeria.

        l.     The money movers would continue to open new bank accounts in the United States, even when banks would flag and close the accounts due to suspicious transactions, to ensure that the catchers would be able to continue convincing victims that wiring money to a U.S.-based bank was part of a legitimate investment or money transfer agreement.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH FIVE
Wire Fraud
(18 U.S.C. §§ 1343 and 2)

26.     The Grand Jury re-alleges and incorporates by reference, as though fully set forth herein paragraphs 1 through 22, 24 and 25 of the Indictment.

27.     On our about the dates set forth below in the Houston Division of the Southern District of Texas and elsewhere, Defendants herein, aiding and abetting others known and unknown to the Grand Jury, having knowingly, and with the intent to defraud, devised and intending to devise, and willfully participated in, a scheme and artifice to defraud, as described in paragraph 25, including all subparagraphs, and for obtaining money by means of false and fraudulent pretenses, and for the purpose of executing such scheme, did knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, as more fully set forth in the counts below.

| COUNT | DATE | DEFENDANT | WIRE |
|-------|------|-----------|------|
| TWO | October 6, 2014 | **CHIOMA OKAFOR** | Chat session between OKAFOR and a co-conspirator in Nigeria discussing OKAFOR posing as Chase Executive #1 in phone call with victim in Russia. |
| THREE | April 11, 2016 | **CHIOMA OKAFOR** | $5,000 wire transfer from Indonesia to BB&T account ending in 9210 in the Southern District of Texas. |
| FOUR | November 17, 2016 | **UJU OKIGBO** | Text message from OKIGBO to co-conspirator in Nigeria giving details of account at Prosperity Bank ending in 2876 for victims to wire money into |
| FIVE | November 8, 2017 | **UJU OKIGBO** | $249,975 wire transfer from Australia to BB&T account ending in 7823 in the Southern District of Texas. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIX
Conspiracy to Launder Monetary Instruments
(18 U.S.C. § 1956(h))

28.     The Grand Jury re-alleges and incorporates by reference, as though fully set forth herein, paragraphs 1 through 22, 24 and 25 of the Indictment.

29.     Beginning in or around October 2014 and continuing through in or about the date of the Indictment the Houston Division of the Southern District of Texas and elsewhere, the defendants,

**UJU OKIGBO**
and
**CHIOMA OKAFOR,**

with others known and unknown to the Grand Jury, knowingly conspired, combined, and agreed to commit the following offenses in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

   a.   to knowingly conduct and attempt to conduct financial transactions, affecting interstate and foreign commerce, involving the proceeds of a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity constituting a felony under state or federal law, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

   b.   to knowingly engage and attempt to engage, within the United States, in monetary transactions in criminally derived property of a value greater than $10,000, such funds involving the proceeds of a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343 and in violation of Title 18, United States Code, 1957.

## Purpose of the Conspiracy

30.     It was a purpose of the conspiracy that the co-conspirators would engage in financial transactions with proceeds of advance-fee schemes so that the defendants and co-conspirators could enrich themselves and ensure that perpetrators of the fraud in Nigeria could receive criminal proceeds without detection or interference by victims, banking authorities, and law enforcement.

## Manner and Means of the Conspiracy

31.     The manner and means by which the defendants and co-conspirators sought to accomplish the object and purposes of the conspiracy included, among other things, the following:

a.     Upon co-conspirators' instructions, money movers would open bank accounts into which victims of the investment and inheritance scams would make payments believing the payments were mandatory to receive their funding.

b.     After receiving victims' funds, money movers normally took the following actions, among others not listed below, almost immediately: (1) wired the funds to other money movers; (2) wired the funds to exporters who received the proceeds in exchange for shipping goods to co-conspirators in Nigeria; (3) withdrew the funds in cash, check, or card debits as personal payment for their laundering services; or (4) purchased vehicles that they then shipped to co-conspirators in Nigeria.

c.     When victims of the scam would attempt to recall a fraudulently induced wire transfer, the money movers would reject the recall and rely on co-conspirators and catchers to pacify the victims with more lies and misrepresentations.

      d.     Money movers would continue to open new bank accounts into which victims of the scam made payments even after other accounts used in the conspiracy were flagged for suspicious transactions and closed by the banks hosting the accounts.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS SEVEN THROUGH TEN
Concealment Money Laundering
(18 U.S.C. §§ 1956(a)(1)(B)(i) and 2)

32.     The Grand Jury re-alleges and incorporates by reference, as though fully set forth herein paragraphs 1 through 22, 24, 25, 30, and 31 of the Indictment.

33.     On or about the following dates, in the Houston Division of the Southern District of Texas, and elsewhere, the following defendants, conducted, attempted to conduct, aided and abetted others to conduct, and willfully caused others to conduct the following financial transactions, affecting interstate and foreign commerce, that in fact involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that (a) the property involved in the transactions represented the proceeds of some form of unlawful activity constituting a felony under state or federal law, and (b) the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity:

| COUNT | DATE | DEFENDANTS | FINANCIAL TRANSACTION |
|---|---|---|---|
| SEVEN | December 12, 2014 | **CHIOMA OKAFOR** | Cash out of $4,000 MoneyGram wire addressed to C.D. at Check Cashing Business #1 located at 3967a South Gessner Road, Houston, Texas |
| EIGHT | January 26, 2015 | **UJU OKIGBO** | Purchase of cashier's check made out to I.O. in the amount of $15,000 from BB&T account ending in 3778 with memo line "Payment for 2010 Honda Crosstour" |
| NINE | September 15, 2016 | **UJU OKIGBO** | Purchase of cashier's check made out to auto broker in the amount of $17,844 from Bank of America account ending in 7028 |
| TEN | April 6, 2017 | **CHIOMA OKAFOR** | $62,000 wire transfer from Amegy Bank account ending in 4004, to Signature Bank account ending in 3314, for purchase of 2016 Mercedes GLE 450 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS ELEVEN THROUGH THIRTEEN
Transactions in Proceeds of Specified Unlawful Activity
(18 U.S.C. §§ 1957 and 2)

34.     The Grand Jury re-alleges and incorporates by reference, as though fully set forth herein paragraphs 1 through 22, 24, 25, 30, and 31 of the Indictment.

35.     On or about the following dates, in the Houston Division of the Southern District of Texas, and elsewhere, the defendant,

**UJU OKIGBO**

did knowingly engage in, attempt to engage in, and aided and abetted others who engaged in the following monetary transactions within the United States, by, through, and to a financial institution affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such funds involving the proceeds of a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| ELEVEN | December 5, 2014 | Wire transfer of $170,000 from BB&T account ending in 3778 to Texas Capital Bank account ending in 7772 for purchase of house located on Magnolia Sky Drive in Richmond, Texas |
| TWELVE | September 19, 2016 | Purchase of cashier's check in the amount of $105,047.60 made out to Momentum Land Rover from funds in Bank of America account ending in 7028 |
| THIRTEEN | December 20, 2017 | Deposit of cashier's check in the amount of $249,732.48 from BB&T Account ending in 7823 into Woodforest National Bank account ending in 1503 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

**COUNT FOURTEEN**
Conspiracy to Wrongfully Use Government Seals
(18 U.S.C. § 371)

36.     The Grand Jury re-alleges and incorporates by reference, as though fully set forth

herein, paragraphs 1 through 22, 24, 25, 30, and 31 of the Indictment.

37.     Beginning in or around October 2014 and continuing through in or about the date

of the Indictment in the Houston Division of the Southern District of Texas and elsewhere, the

defendants,

**MARITA RANALAN UNDERWOOD**
**JOHN CHRISTIAN RUTLEDGE,**
and
**OSA MAY MARTIN**

with others known and unknown to the Grand Jury, knowingly conspired, combined, and agreed

to commit the following offense against the United States, namely, to fraudulently and

wrongfully affix and impress the seal of a department and agency of the United States, to and

upon a certificate, instrument, commission, document, and paper, in violation of Title 18, United

States Code, Section 1017.

**Purpose of the Conspiracy**

38.     It was a purpose of the conspiracy that the defendants and co-conspirators would

unlawfully enrich themselves by deceiving victims of the investment scam and the inheritance

scam with bogus documents that contained false and fraudulent seals of the U.S. government and

its agencies, to ensure the victims would believe the investment or inheritance was legitimate and

that payments they had made, and would make in the future, were part of a legitimate transaction

rather than a scam.

## **Manners and Means of the Conspiracy**

39.     The manner and means by which the defendants and co-conspirators sought to accomplish the object and purposes of the conspiracy included, among other things, the following:

a.      Catchers would convince victims of the investment scam that the U.S. embassy or consulate where they lived would ratify or notarize the investment agreement, and that the victims needed to give the representatives approximately $5,000 to $10,000 in cash for that purpose.

b.      A representative would enter the U.S. embassy or consulate on the pretense that an official at the embassy was going to ratify or notarize the investment agreement and that the cash they carried from the victim was for that purpose, when in reality: (a) the representative intended to keep the money, and (b) the investment agreement was not notarized in the embassy or consulate.

c.      Co-conspirators would create bogus documents to make it look like, during the course of the representative's embassy or consulate visit, the notarization had occurred and the payment had been made; those bogus documents included, among others, a signature page of the bogus investment agreement that would contain a false stamp or seal of the U.S. embassy or consulate, and a receipt for the cash payment purporting to be from the U.S. embassy or consulate that contained a false seal of the U.S. Department of State.

d.      On some occasions, a representative would carry into the U.S. embassy or consulate a pre-printed investment agreement with a U.S. government seal already fraudulently printed on it as well as a fake payment receipt for that embassy or consulate; these documents

would then be given to the victim upon the representative's exit from the embassy, or shortly thereafter.

        e.     On other occasions, a representative would make the same sham visit to the U.S. embassy or consulate, but inform the victims that the financial institution would email the victim the receipt and notarized agreement, knowing that the co-conspirators would be emailing the victim the same bogus documents containing the false and fraudulent seals of the U.S. government in furtherance of the scam.

        f.     The falsely notarized investment agreements and receipts, as well as additional documents containing false U.S. government seals, would be used to induce additional fraudulent payments from victims.

### Acts in Furtherance of the Conspiracy

40.     In furtherance of the conspiracy, and to effect the objects thereof, defendants and other persons known and unknown to the grand jury, performed or caused the performance of one or more of the following acts, among others, in the Southern District of Texas and elsewhere:

41.     On or about December 2, 2014, after having receiving a falsely notarized investment agreement and bogus receipt from UNDERWOOD and co-conspirators, victim T.D. made a $100,000 wire payment from Canada to a BB&T bank account ending in 3778, in the name of U-4CS Services, LLC, in the Southern District of Texas.

42.     On or about September 25, 2015, after having received a falsely notarized investment agreement and bogus receipt from RUTLEDGE and co-conspirators, victim P.N. made wire payments amounting to $24,940, in two equal amounts of $12,470, from Denmark to

BB&T bank account ending in 3778, in the name of U-4CS Services, in the Southern District of Texas.

43.     On or about January 7, 2016, after having received a falsely notarized investment agreement and bogus receipt from MARTIN and co-conspirators, victim J.K. made a $50,000 wire payment from South Korea to a Bank of America bank account ending in 3244, in the name of U-4CS Services, LLC, in the Southern District of Texas.

All in violation of Title 18, United States Code, Section 371.

## COUNT FIFTEEN
Aggravated Identity Theft
(18 U.S.C. § 1028A(a)(1))

44.     The Grand Jury re-alleges and incorporates by reference, as though fully set forth herein paragraphs 1 through 22, 24, 25, 30, and 31 of the Indictment

45.     On or about October 6, 2014, in the Houston Division of the Southern District of Texas, and elsewhere, defendant,

## CHIOMA OKAFOR

knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification, that is, the name of a person, that OKAFOR knew belonged to another person, during and in relation to a felony violation of Title 18, United States Code, Section 1343, namely, OKAFOR posed as Chase Executive #1 on a phone call with victim I.Z. as part of a scheme to convince victim I.Z. that his supposed investment opportunity with Chase was authentic when it was in fact not.

All in violation of Title 18, United States Code, Section 1028A(a)(1).

## NOTICE OF FORFEITURE
(18 U.S.C. § 981(a)(1)(C))

46.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28,

United States Code, Section 2461(c), the United States gives notice to defendants,

**UJU OKIGBO,**
**CHIOMA OKAFOR,**
**MARITA RANALAN UNDERWOOD,**
**JOHN CHRISTIAN RUTLEDGE,**
and
**OSA MAY MARTIN**

that in the event of conviction of any of the conspiracy and wire fraud offenses charged in

Counts One through Five of this Indictment, all property, real or personal, which constitutes or is

derived from proceeds traceable to such offense, is subject to forfeiture.

## NOTICE OF FORFEITURE
(18 U.S.C. § 982(a)(1))

47.     Pursuant to Title 18, United States Code, Section 982(a)(1), the United States

gives notice to defendants,

**UJU OKIGBO**
and
**CHIOMA OKAFOR**

that in the event of conviction of any money laundering offense as charged in Counts Six though

Thirteen of this Indictment, all property, real or personal, involved in money laundering offenses

or traceable to such property, is subject to forfeiture.

### Property Subject to Forfeiture

48.     The property subject to forfeiture includes, but is not limited to, the following

property:

a.      2014 Land Rover Range Rover, VIN No. SALGS3TF3EA183561;

b.      real property on Magnolia Sky Drive in Richmond, Texas, together with all improvements, buildings, structures and appurtenances, and legally described as follows:

> Lot Thirty-One (31), in Block Nine (9), of WATERVIEW ESTATES, Sec. 1, a subdivision in Fort Bend County, Texas, according to the map or plat thereof, recorded under Film Code No. 20040042 of the Map Records of Fort Bend, Texas.

c.      $99,473.80 seized from a Woodforest National bank account with an account number ending in 1503, held in the name of ONAC Services LLC.

## <u>Money Judgment and Substitute Assets</u>

49.      The United States may seek the imposition of a money judgment against each defendant.  In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the defendants in substitution up to the total value of the property subject to forfeiture.


A TRUE BILL

Original Signature on File

_____
FOREPERSON OF THE GRAND JURY


RYAN K. PATRICK
UNITED STATES ATTORNEY

By: _____
Suzanne Elmilady
Assistant United States Attorney
(713) 567-9000


SANDRA MOSER
ACTING CHIEF
Fraud Section, Criminal Division
U.S. Department of Justice

By: _____
William Johnston
Trial Attorney
(202) 514-2000