**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **CRIM. NO. H-18-068** |
| | § | |
| **OSA MAY MARTIN and** | § | |
| **TOCHUKWU NWOSISI** | § | |

<u>**GOVERNMENT'S TRIAL BRIEF**</u>

TO THE HONORABLE ALFRED BENNETT:

COMES NOW the United States of America, through Jennifer Lowery, United States Attorney, and Suzanne Elmilady, Assistant U.S. Attorney, and Assistant Chief William E. Johnston and Trial Attorney Philip Trout of the Fraud Section of the U.S. Department of Justice's Criminal Division, and submits this Trial Brief in connection with the March 2, 2022 trial of Osa Martin and Tochukwu Nwosisi.

<u>**BACKGROUND**</u>

Martin and Nwosisi are charged with participating in an elaborate international advance-fee scheme run from Nigeria. The scheme involved fraudulent offers of investment funding and inheritances to victims around the world and the use of fabricated U.S. State Department documents to convince victims that the U.S. government was sponsoring their deal. Victims were convinced to wire money to U.S. bank accounts under the false belief that such payments were needed to release a much larger sum of money. Victims' money was then laundered through the U.S. bank accounts so the funds would reach the scheme's masterminds in Nigeria.

The scheme began when coconspirators, known as "catchers," sent phishing emails to victims in which they posed as U.S. bank officials, typically from BB&T. If a victim became interested in the fraudulent offer, the catchers would continue the impersonation via phone calls.

Once a victim appeared committed to the supposed deal, coconspirators dispatched a U.S. citizen to the country where the victim lived to pose as a representative of BB&T and sign a supposed investment agreement with the victim on behalf of the bank.

The representative would make a sham visit to the local U.S. embassy on the false pretense an embassy official had to notarize the investment agreement for a fee of $7500. In reality, the representative would pocket the $7500. As part of the sham embassy visits, coconspirators affixed bogus notarizations and produced fake receipts for the $7500, which were given to the victims. Catchers would then convince victims to make wire payments to bank accounts in the United States under the false belief that such payments were administrative fees or deposits that would be refunded once the investment deal was complete. After the victims' money entered the U.S. bank accounts, the account holders, or "money movers," would either purchase cars and ship them to Nigeria, or send the funds to participants in a black market U.S. Dollar-Nigerian Naira currency exchange so that the scheme's perpetrators could receive their ill-gotten gains back in Nigeria. Money movers received substantial compensation for laundering victims' funds.

Martin and Nwosisi were charged in a second superseding indictment filed on October 3, 2018. ECF No. 162. Martin is alleged to have acted as a representative in the scheme and is charged with one count of conspiracy to commit wire fraud and one count of conspiracy to wrongfully use government seals. Nwosisi is alleged to have acted as money mover using his Indianapolis-based used-car dealership, Indyrides, and is charged with one count of conspiracy to commit money laundering and one count of concealment money laundering.

At trial, the government intends to prove that Defendant Martin knew she was participating in a fraudulent scheme when she realized her role as a representative required her to make sham visits to the U.S. embassy and traffic in fraudulent State Department documents and seals. Indeed,

the evidence at trial will show that Martin went on eight additional international trips in furtherance of the scheme *after* she knew the people supposedly employing her were creating and using fraudulent documents and requiring her to visit U.S. embassies on false pretenses. The government intends to prove that Defendant Nwosisi knew that his receipt and transfer of victims' funds involved criminally derived proceeds because his actions and words do not reflect those of an unwitting money mule: he repeatedly made suspicious transactions for substantial compensation even though bank after bank closed and flagged his accounts, then concealed the proceeds from his laundering activity from the IRS, and made misleading statements to agents when questioned about his activity. The evidence at trial will focus on documents and testimony demonstrating the defendants' respective guilty knowledge.

Victims of the BB&T scam will testify about meeting with Osa Martin and handing her $7500 and watching her enter the U.S. embassy for the supposed purpose of notarizing their investment agreement. Victims will testify about believing they had to make wire payments to Nwosisi's Indyrides bank accounts to complete their supposed investment deal with BB&T. Employees of BB&T, Wells Fargo, and Bank of America will testify as to why their banks closed some of Nwosisi's business bank accounts due to suspicious wire transfers. An FBI forensic accountant will admit charts showing that Nwosisi received substantial compensation for laundering victims' funds and omitted the deposits of victims' funds from his tax returns. Witnesses from BB&T and the State Department will testify that the investment agreements were fraudulent, that BB&T never offered investment agreements, and the State Department never notarized them. And a case agent will testify about his respective interviews with Martin and Nwosisi, in which each made incriminating statements, and introduce many of the communications sent and received by the defendants with co-conspirators in the course of their participation in the

scheme.  Certain custodial witnesses may also testify if the authenticity of certain exhibits is contested.

## **TRIAL ISSUES**

The government filed the following motions that are currently pending as of the date of this filing:

1. Motion in Limine to Exclude Evidence of Defendant Martin's History as a Fraud Victim (ECF No. 258);

2. Motion in Limine to Preclude Introduction of Self-Serving Hearsay (ECF No. 259);

3. Motion in Limine to Preclude Defendant Martin's Proposed Mental Condition Expert Testimony (ECF No. 260);

4. Motion in Limine to Admit Defendant Nwosisi's Prior Statements from Proffer Session for Limited Purposes (ECF No. 431);

5. Motion in Limine to Admit Evidence of Defendant Nwosisi's Tax Returns (ECF No. 432);

6. Amended Motion in Limine to Exclude Evidence of Defendant's Detention Abroad (ECF No. 442).[1]

The defendants filed the following motions that are currently pending as of the date of this filing:

1. Defendant Martin's Motion to Dismiss Party (ECF No. 78);

2. Defendant Martin's Motion for Pretrial Notice of 404(b) (ECF No. 79);

3. Defendant Martin's Motion for Discovery (ECF No. 80);

4. Defendant Martin's Motion in Limine (ECF No. 82);

5. Defendant Martin's Motion to Sever Defendant Osa Martin (ECF No. 101);

---

[1] This motion supersedes the one filed at ECF No. 433, which should now be denied as moot.

6. Defendant Nwosisi's Motion to Continue Trial (ECF No. 434).

In addition to the pending motions referenced above, the government notes the following factual and legal issues that may arise in the course of the trial and provides relevant supporting authority for the government's positions.

## I.   The government's case agent may offer his lay opinion to interpreting text messages and emails.

The government intends to introduce text messages sent and received by defendant Nwosisi with co-conspirator (and co-defendant) Uche Diuno, as well as emails between defendant Martin and co-conspirators in the BB&T scheme.  The emails and text messages will be introduced through Jim Spalding, a special agent with the Department of State Office of Inspector General (DOS-OIG) and one of the case agents in this matter.  With respect to the Nwosisi communications, some of the individuals mentioned and phrases used in the text messages pertain to transfers of victims' funds through a black market Dollar-Naira currency exchange so the proceeds could reach the scheme's mastermind in Nigeria.  The government intends to ask Agent Spalding for his interpretation of those phrases and the identity of the people mentioned.  With respect to Martin's communications, Agent Spalding will be asked to identify the individuals, conduct, and documents mentioned in the emails.  Under Federal Rule of Evidence 701 and controlling Fifth Circuit law, such testimony is permissible lay opinion testimony.

Rule 701 permits a lay witness to offer opinion testimony if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [the rule governing expert witnesses]."  The Fifth Circuit has repeatedly held that Rule 701 permits a case agent to offer testimony about the specific meaning of words and phrases used by defendants the agent has investigated.  *See United States v.*

*Haines*, 803 F.3d 713, 729 (5th Cir. 2015) (agent testimony explaining the meaning of phrases captured on wiretap was permissible because "testimony was not based on [agent's] expertise with the drug trade writ large; rather, this testimony is based on his familiarity with this particular case"); *United States v. Miranda*, 248 F.3d 434, 441 (5th Cir. 2001) (agents' personal participation in investigation "allowed him to form opinions concerning the meaning of certain code words used in this drug ring based on his personal perceptions").  For example, in the context of drug cases, the Fifth Circuit has "recognized that testimony about the meaning of drug code words can be within the proper ambit of a lay witness with extensive involvement in the underlying investigation."  *United States v. Akins*, 746 F.3d 590, 599 (5th Cir. 2014).  It is of no moment whether the agent has some specialized knowledge that allows him to interpret certain phrases.  "Testimony need not be excluded as improper lay opinion, even if some specialized knowledge on the part of the agents was required, if it was based on first-hand observations in a specific investigation."  *United States v. El-Mezain*, 664 F.3d 467, 514 (5th Cir. 2011).

Here, Agent Spalding was one of the original case agents and has been involved in the investigation since 2015.  As will be demonstrated at trial, he has gained particularized knowledge about the meaning of certain phrases pertaining to the BB&T scam, the exchange of US Dollars for Nigerian Naira, and the identity of certain people involved in these exchanges through his personal involvement in a years-long investigation.  Such testimony is rationally based on the agent's perception, will prove helpful to the jury in understanding Martin's and Nwosisi's respective words, and will not be based on scientific, technical or specialized knowledge within the scope of Rule 702.  Accordingly, it should be permitted.

## II.     The government intends to introduce exhibits generated with Google Maps

Several exhibits that the government intends to introduce at trial were generated using Google Earth, a publicly available software program containing high resolution maps of the world which allows its users to plot coordinates and "ticks" using both standard mailing addresses and GPS coordinates.  These exhibits include a map of Indianapolis to show the location of various bank branches used by Nwosisi, as well as a map of the southern Indiana and northern Kentucky region to show the distance between Indianapolis and the closest BB&T branches in New Albany, Indiana and Louisville, Kentucky.  *See* Gov't Exs. 404 – 406.  Testimony by the user of a common software program is more than sufficient to authenticate the output from that program.  *See, e.g., United States v. Espinal-Almeida*, 699 F.3d 588, 612-13 (1st Cir. 2012) (GPS output from Google Earth program authenticated by non-expert testimony of how program was used).  The Court can also take judicial notice of the program's reliability.  *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015) (noting that court could take "judicial notice" of Google Earth's reliability for purposes of authenticating map with GPS coordinates generated by Google Earth); *Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (noting that "we take judicial notice of a Google map and satellite image as a source whose accuracy cannot reasonably be questioned for purposes of this case" (alterations incorporated; citation and internal quotation marks omitted)).

Furthermore, there is no hearsay problem with such exhibits because outputs from software programs are not hearsay statements.  *See United States v. Ballesteros*, 751 F. App'x 579, 580 (5th Cir. 2019) (unpublished) (noting "ample persuasive authority" that machine statements are not hearsay); *Lizarraga-Tirado*, 789 F.3d at 1110 ("[W]e join other circuits that have held that machine statements aren't hearsay."); *United States v. Lamons*, 532 F.3d 1251, 1263 (11th Cir. 2008); *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008); *United States v. Washington*,

498 F.3d 225, 230 (4th Cir.2007); *United States v. Hamilton*, 413 F.3d 1138, 1142 (10th Cir. 2005); *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003).

### III.    The government intends to introduce Rule 1006 summary exhibits

To aid the jury in evaluating voluminous documents and bank records at trial, the Government intends to introduce a number of summary exhibits into evidence pursuant to Fed. R. Evid. 1006.  The voluminous records being summarized need not themselves be admitted into evidence; they need only be admissible.  However, Rule 1006 also "applies to summary charts based on evidence *previously admitted* but which is so voluminous that in-court review by the jury would be inconvenient."  *United States v. Harms*, 442 F.3d 367, 375 (5th Cir. 2006) (citation omitted) (emphasis added).  When admitted under Rule 1006, a summary chart is itself evidence. *See United States v. Williams*, 264 F.3d 561, 575 (5th Cir. 2001).[2]

Here, the government intends to introduce Nwosisi's bank records into evidence.  *See* Gov't Exs. 300-375.  The government also intends to introduce into evidence a summary of these voluminous bank records by FBI forensic accountant Manon Randle.  The preparer of a chart may use inferences so long as they are supported in the evidence.  *See United States v. Armstrong*, 619 F.3d 380, 384 (5th Cir. 2010) ("The presence of an inference itself is not prejudicial, for under rule 1006, '[t]he essential requirement is not that the charts be free from reliance on any assumptions but rather that these assumptions be supported by evidence in the record.'" (quoting *United States v. Buck*, 324 F.3d 786, 791 (5th Cir. 2003)).

---

[2] Rule 1006 charts "are distinguishable from pedagogical aids, which are merely to assist the jury in understanding the evidence and should be accompanied by an appropriate limiting instruction." *Id.*  Drafts of the government's summary exhibits were produced to the defendants on January 6, 2020.

Moreover, merely because a summary chart contains calculations does not mean the testifying witness must be qualified as an expert. *See United States v. Jennings*, 724 F.2d 436, 443 (5th Cir. 1984) ("[W]hen a chart does not contain complicated calculations requiring the need of an expert for accuracy, no special expertise is required in presenting the chart." (citing *United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979)); *United States v. Aubrey*, 800 F.3d 1115, 1129 (9th Cir. 2015) ('Simply because [summary witness] stated that he used 'last-in-first-out' to construct his summary charts did not transform his testimony into expert testimony. Instead, [summary witness] was merely providing foundation for the evidence he was presenting."); *Teen–Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980) ("The fact that Zeitz might have been able to qualify as an expert witness on the use of accepted accounting principles in the calculation of business losses should not have prevented his testifying on the basis of his knowledge of appellant's records about how lost profits could be calculated from the data contained therein."). Accordingly, FBI forensic accountant Randle does not need to be qualified as an expert.

## IV. The Court should disallow improper impeachment with FBI 302s and DOS-OIG MOIs

The Government has disclosed to the defendants FBI memoranda ("302s") and DOS-OIG memoranda of their interviews with witnesses in this case. These are written impressions or summaries by the FBI agent or DOS-OIG agent of what the witnesses said. The memoranda are not verbatim transcripts, and the government's witnesses have not adopted them as their own. As such, they are not the witnesses' prior statements, and the Defendants should not be allowed to impeach the witnesses with 302s, or read aloud their contents to the jury. *See Palermo v. United States*, 360 U.S. 343, 350 (1959) (It would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product

9

of the investigator's selections, interpretations and interpolations."); *United States v. Judon*, 581 F.2d 553, 555 (5th Cir. 1978) (noting that 302s were not Jencks Act material and "would threaten the witnesses with impeachment on the basis of statements that they did not make"); *United States v. Leonardi*, 623 F .2d 746, 757 (2d Cir. 1980) (refusing to admit FBI agent's written statements for impeachment because it was created five days after the interview, did not purport to memorialize all of witness' statements, and witness did not previously adopt document).

The defense can ask the witness whether they recall making a prior statement to the government.  If the witness answers no and further states that the memoranda may refresh his or her recollection, the defense can then use the memoranda to refresh the witness's recollection, but not to imply to the jury that the memoranda contains the witness's prior statement.  If after showing the witness the memoranda, the witness still does not recall making the prior statement, there is nothing to be impeached while the witness is on the stand.[3]  And defense counsel should not be permitted to read aloud the memoranda to the jury or introduce it into evidence as a prior inconsistent statement.

## V.    The Court should exclude an irrelevant excerpt of a recording related to Defendant Nwosisi's interview and preclude questioning about the irrelevant statements

On January 18, 2018, FBI Special Agent John Chiue and DOS-OIG Special Agent James Spalding conducted an interview of Defendant Nwosisi.  The agents recorded the interview, and the government intends to introduce a copy of the recording and a transcript of the recording at trial that omits the final minute.  After the agents concluded the interview and walked away from Defendant Nwosisi, Special Agent Chiue made certain comments to another FBI agent that were

---

[3] If the Defendant wants to complete the impeachment, he must call the agent who wrote the memoranda to the stand to ask the agent whether the witness, in fact, made the statement that the witness could not recall making.

also recorded, including a comment that he did not consider Nwosisi to be a subject of the investigation.[4]  Those comments are both irrelevant and inadmissible hearsay, and omitting them from the version of the recording admitted at trial does not in any way violate Federal Rule of Evidence 106.

The statements of an agent outside the presence of the defendant regarding the defendant's status as a subject of the investigation – particularly while that investigation remains ongoing – are irrelevant and should be excluded.  The statement does not have any tendency to make the existence of any fact that is of consequence in determining the charges against Defendant Nwosisi more or less probable.  *See* Fed. R. Evid. 401.  In *United States v. Crosby*, 713 F.2d 1066, 1074 (5th Cir. 1983), the Fifth Circuit upheld the district court's exclusion of a portion of a tape recording in which a police officer represented to the defendant that he would not be jailed if he gave himself up and released his hostages.  The Fifth Circuit found that "[t]he statement of the police officer bore no legal relation to the charges against Crosby, and thus was properly excluded."  713 F.2d 1066 at 1074.  The Court should similarly exclude Special Agent Chiue's comments.

Moreover, the statement made by Special Agent Chiue is undoubtedly hearsay and inadmissible because it is a statement of a declarant not made while testifying at the current trial and the Defendant would be offering it to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801.  In *United States v. Owings*, No. 18-120, 2019 WL 303010, at *1 (W.D. La. Jan. 23, 2019), the court granted the government's motion in limine to exclude emails between special agents in which one agent wrote, "We are not going to be able to pursue criminal prosecution because there

---

[4] Specifically, the Court should permit the introduction into evidence a recording that ends at 01:39:21.

11

are too many issues that affect jury appeal in this case, including conflicting and confusing letters from the SSA."  The court held that the emails were inadmissible hearsay and further barred the defense from questioning the agents – or other agency personnel – about the opinions expressed in the emails, including but not limited to opinions about the strength of the case, the appeal of the case to a jury, and the ambiguity of agency correspondence sent to defendant.  2019 WL 303010, at *2-3.  Similarly here, the Court should preclude the defense from introducing Special Agent Chiue's statement and from questioning any agent regarding the statement or their opinions about the strength of the government's case.  *See id.* at *1 ("Just as a prosecutor could not ask an investigator to testify about how strong the criminal case is against a particular defendant or express an opinion that the evidence is clear and unambiguous, nor can the defense question an investigator about her perception of the weaknesses of a case or whether the case should have been prosecuted at all.").

Nor is Federal Rule 106 applicable, because the portion to be excluded is not relevant to the issues.  *See United States v. Crosby*, 713 F.2d 1066, 1074 (5th Cir. 1983) ("At the same time Fed. R. Evid. 106 encourages completeness in writings or recordings, it restricts a requirement of completeness by the qualification that the portion sought to be admitted must be relevant to the issues, and only the parts which qualify or explain the subject matter of the portion offered by the opponent need be admitted.").  The Court should therefore permit a truncated version of the recording, ending at 01:39:21, to be admitted into evidence.  It should further exclude the defense

from questioning any agent about their opinions regarding the strength of the government's case.

Respectfully submitted,

JENNIFER LOWERY
United States Attorney

By:     /s Suzanne Elmilady
SUZANNE ELMILADY
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas
(713) 567-9000

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By:     /s William Johnston
WILLIAM E. JOHNSTON
Assistant Chief
PHILIP TROUT
Trial Attorney
1400 New York Ave NW
Washington, D.C.
(202) 514-0687

<u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the Government's Trial Brief was filed via ECF

and delivered to counsels for both defendants on February 22, 2022.


<u>/s/ Philip Trout</u>
Philip Trout
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice

14